IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

KARLA DENISE WEST )
)
Plaintiff, )
)
v. ) CASE NO. 1:11-cv-1083-TFM
) [wo]
MICHAEL ASTRUE, )
Commissioner of Social Security, )
)
Defendant. )

**MEMORANDUM OPINION AND ORDER**

Karla Denise West ("Plaintiff" or "West") applied for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401 *et seq*., and supplemental security income under Title XVI §§1381-1383c, on March 14, 2008. *See* Doc. 10 at 1. After remand by the Appeals Council, West received a second hearing before an administrative law judge ("ALJ") who rendered an unfavorable decision on May 27, 2011. Tr. 31. West subsequently petitioned for review to the Appeals Council who rejected review of West's case on October 13, 2011. Tr. 1. As a result, the ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner"). *Id.* Judicial review proceeds pursuant to 42 U.S.C. § 405(g), and 28 U.S.C. § 636(c). After careful scrutiny of the record and briefs, for reasons herein explained, the Court AFFIRMS the Commissioner's decision.

## I. Nature of the Case

West seeks judicial review of the Commissioner's decision denying her application

for disability insurance benefits and supplemental security income benefits. United States District Courts may conduct limited review of such decisions to determine whether they comply with applicable law and are supported by substantial evidence. 42 U.S.C. § 405. The court may affirm, reverse and remand with instructions, or reverse and render a judgment. *Id*.

## II. Standard of Review

The Court's review of the Commissioner's decision is a limited one. The Court's sole function is to determine whether the ALJ's opinion is supported by substantial evidence and whether the proper legal standards were applied. *See Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"The Social Security Act mandates that 'findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.'" *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting 42 U.S.C. §405(g)). Thus, this Court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)); *Foote*, 67 F.3d at 1560 (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

If the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the evidence preponderates against the Commissioner's findings. *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003); *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (quoting *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)). The Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560 (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," but rather it "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (quoting *Bloodsworth*, 703 F.2d at 1239).

The Court will also reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). There is no presumption that the Commissioner's conclusions of law are valid. *Id.*; *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (quoting *MacGregor*, 786 F.2d at 1053).

## III. STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement,

provided they are both insured and disabled, regardless of indigence.[1] *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line.[2] Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled. *Patterson v. Bowen*, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986). Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable to

> Engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are

---

[1] DIB is authorized by Title II of the Social Security Act, and is funded by Social Security taxes. *See* Social Security Administration, Social Security Handbook, § 136.1, *available at* http://www.ssa.gov/OP_Home/handbook/handbook.html

[2] SSI benefits are authorized by Title XVI of the Social Security Act and are funded by general tax revenues. *See* Social Security Administration, Social Security Handbook, §§ 136.2, 2100, *available at* http://www.ssa.gov/OP_Home/handbook/handbook.html

demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[3]

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

> An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

The burden of proof rests on a claimant through Step 4. *See Phillips v. Barnhart*, 357 F.3d 1232, 1237-39 (11th Cir. 2004). Claimants establish a prima facie case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id.*

To perform the fourth and fifth steps, the ALJ must determine the claimant's

[3] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

Residual Functional Capacity (RFC). *Id*. at 1238-39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id*. It also can contain both exertional and nonexertional limitations. *Id*. at 1242-43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id*. at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines[4] ("grids") or hear testimony from a vocational expert (VE). *Id*. at 1239-40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each factor can independently limit the number of jobs realistically available to an individual. *Id.* at 1240. Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled." *Id*.

## IV. Administrative Findings and Conclusions

West, age 31 at the time of the hearing, has completed the 10th grade and can read and write. Tr 64-65. West performed past relevant work as a cashier (unskilled, light), housekeeper (unskilled, light), and hostess (semi-skilled, light). Tr. 52-53. West has not engaged in substantial gainful work activity since her alleged disability onset date of December 26, 2007. Tr. 23. West meets the insured status requirements of the Social Security Act through March 31, 2012. *Id.* West claims she is unable to work because of

[4] *See* 20 C.F.R. pt. 404 subpt. P, app. 2; *see also* 20 C.F.R. § 416.969 (use of the grids in SSI cases).

dermatomyositis which causes pain, muscle weakness, fatigue, and rashes, as well as bad migraine headaches. Tr. 45-46, 49. West rates her average daily pain as a level nine on a ten point scale with ten being the highest level of pain. Tr. 46.

West received treatment from various medical practitioners and the ALJ considered the medical records from these practitioners. Tr. 23-25. West was hospitalized February 19, 2008 due to shortness of breath, and the medical records indicated that congestive heart failure or pneumonia were suspected. Tr. 23, 94. There is no indication that any firm diagnosis was made. *Id.* West was again hospitalized on April 23, 2008 due to muscle weakness, and records show that Dr. Edmund LaCour, M.D. ("Dr. LaCour")[5] found that EMG abnormalities were consistent with myopathy. Tr. 23-24, 94. West was treated several times throughout May of 2008 due to shortness of breath and general weakness. Tr. 607-617. A left deltoid muscle biopsy revealed myopathy compatible with dermatomyositis. Tr. 24, 94, 610, 639. On May 21, 2008, Dr. LaCour noted that West's dermatomyositis had improved dramatically with medications and the remainder of the records from 2008 described West as doing better and doing well. Tr. 24, 94, 608.

Dr. Randall G. Jordan, Psy.D ("Dr. Jordan") evaluated West on May 16, 2008. Tr. 24, 95. Dr. Jordan found that West had no unusual fine or gross motor anomalies or gestures; her affect was restricted to some degree but was congruent with her mood; she was fully oriented; and all concentration, memory, fund of information, judgment, insight and other abilities were not compromised. *Id.* Dr. Jordan found West's intelligence was

[5] Many records from Dr. LaCour's office were created by Dr. Brett Johnson, but for the purposes of the factual background, the Court will consider medical record's from Dr. LaCour's office together under his name.

in the Low Average to Average range, but found that she has no more than a slight impairment in social, occupational, or school functioning. *Id.* Dr. Jordan found that activities such as bathing and grooming were not limited, and she was able to do general cleaning and prepare light meals. *Id.* Dr. Jordan found that West could function independently, her ability to carry out and remember instructions of a simple, one-step nature is not compromised, and she is able to respond well to coworkers, supervision, and everyday work pressures. *Id.* Dr. Jordan's diagnostic impression was "depressive disorder, NOS secondary to pain process." *Id.*

On September 18, 2008, Dr. LaCour sent a letter on West's behalf stating that West has dermatomyositis which is a condition that causes "inflammation of the muscles and skin, and which could cause significant weakness." Tr. 24, 91, 661. Dr. LaCour stated West will be on immunosuppressant medicines for the "indefinite future." *Id.* Dr. LaCour also stated that West was totally disabled from doing any type of work. *Id.* On February 11, 2009, West returned to Dr. LaCour's office for cold symptoms, but no symptoms of dermatomyositis or lupus were reported. Tr. 24. West returned again on March 30, 2009, and Dr. LaCour noted that West was "doing well." *Id.* Similarly, Dr. LaCour reported West as "doing fine" except for some stiffness of the neck on June 1, 2009. *Id.* Records from August 11, 2009 note that West reported upper arm weakness; however, no other symptoms of dermatomyositis were noted. Tr. 24, 851. West reported that she had a "little bit of trouble with picking up a 30-pound child." Tr. 24, 850. On October 12, 2009, Dr. LaCour noted symptoms of depression. Tr. 24, 843. During another visit on December 15, 2009, Dr. LaCour noted that with regards to her

dermatomyositis she was "clinically doing well," and that her strength has remained "excellent," and that she had no complaints of weakness or pain. Tr. 24-25, 849. On February 15, 2010, Dr. LaCour noted that she had been off of her medication for two weeks, but everything was normal, her strength "is the same and remains very good overall," and her joints had an "[e]xcellent pain-free range of motion throughout." Tr. 25, 847. On April 15, 2010, West was described as asymptomatic due to her normal strength, lack of manifestation of any weakness, pain-free range of motion and all rashes had cleared. Tr. 25, 839. July 20, 2010 was West's next and last visit with Dr. LaCour. Tr. 25, 825. She reported pain in her muscles and decreased strength, but Dr. LaCour noted that she had stopped taking her medicine nearly a month prior. *Id.*

West also sought treatment from Dr. G. Barry Taylor, M.D. ("Dr. Taylor"). Tr. 25. On January 20, 2010, West reported various problems including weakness of her muscles, and neck and back pain. *Id.* Dr. Taylor reported no significant findings, and he noted that West ambulated well. *Id.* Dr. Taylor's impression was suspected dermatomyositis, migraine, rhinitis, and back pain. *Id.* West returned to Dr. Taylor's office on August 2, 2010. *Id.* Dr. Taylor's impression was periodic swelling of the left side of West's face, allergic rhinitis/sinusitis, excessive earwax, and muscle spasm of the neck and shoulders. *Id.*

Dr. Sam R. Banner, D.O. ("Dr. Banner") examined West on June 8, 2010. Tr. 25, 814-19. Dr. Banner noted West's history, but on examination he found no abnormalities other than some loss of ranges of motion and 3/5 strength. *Id.* Dr. Banner reported that West had normal muscle tone, no muscle atrophy, and retained satisfactory fine and gross

motions of her hands. *Id.* Dr. Banner further noted West had no spasms of the neck and back, no sensory losses, and no skin abnormalities. *Id.* Dr. Banner diagnosed dermatomyositis, lupus, and depression, and concluded that West would need lifelong medical care. *Id.*

On June 25, 2010, Dr. Jordan reevaluated West, and reported that West has a depressive disorder that is mild in degree. *Id.* Dr. Jordan noted that he did not think that West could function independently because of her reported pain, and further noted that West's physical issues seemed to be the primary limiting factor. *Id.* Dr. Jordan found that West could do multi-step tasks with some supervision, and her ability to respond to other people was only mildly compromised. *Id.*

After review of the medical records, the ALJ found that the described impairments of dermatomyositis, systemic lupus erythematosus, and depression limit West's ability to perform a full range of exertional and nonexertional work-related activities, and are severe within the definition of the Act. *Id.* The ALJ found that West "has the residual functional capacity to perform light work" except that she is "limited to performing simple workplace duties and procedures, [. . .] she is limited to simple 1, 2, and 3 step instructions [. . .], [s]he will miss a day of work a month [. . .], [h]er public contacts should be brief and non-confrontational [. . .], [and] changes should be simple and gradually introduced." Tr. 28. The ALJ found that West is capable of performing past relevant work as a housekeeper. Tr. 30.

## V. Issues

West raises two issues for judicial review:

(1) Whether the ALJ erred in giving greater weight to the State agency, non-examining physician over Dr. Lacour, West's treating rheumatologist; and

(2) Whether the ALJ failed to pose a complete hypothetical question to the VE.

*See* Doc. 10 at 5.

## VI. Discussion

### A. The ALJ did not err in giving greater weight to the State agency, non-examining physician over Dr. Lacour, West's treating rheumatologist.

West argues that "the Commissioner's decision should be reversed, because the ALJ erred in giving greater weight to the State agency, non-examining physician over Dr. Lacour, Ms. West's treating rheumatologist." *Id.* Specifically, West claims that the ALJ adopted limitations based upon the State agency evaluations completed by Dr. Jordan, and rejected her treating physician's opinion that she is disabled due to her impairments. *Id.* To be technical, Dr. Jordan actually examined West and is, therefore, not considered a non-examining physician. Tr. 810-13. The SSA defines "Nonexamining source" to mean "a physician, psychologist, or other acceptable medical source who has not examined you but provides a medical or other opinion in your case." 20 C.F.R. 404.1502 (2011). Alternatively, the SSA defines "Nontreating source" to mean "a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you. The term includes an acceptable medical source who is a consultative examiner for us, when the consultative examiner is not your treating source." *Id.* Therefore, it is clear that Dr. Jordan is not a nonexaming physician as West asserts, but rather Dr. Jordan is a nontreating consultative physician

due to his limited treatment relationship with West. However, the Court interprets West's argument to assert that the ALJ erred in giving greater weight to the consultative physician over West's treating physician.

"An administrative law judge must accord 'substantial' or 'considerable' weight to the opinion of a claimant's treating physician unless "good cause" is shown to the contrary." *Broughton v. Heckler*, 776 F.2d 960, 961-62 (11th Cir. 1985) (citing *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982). However, the Eleventh Circuit has also held "[t]he law is clear that, although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). In rejecting a treating physician's opinion, the ALJ "must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." *MacGregor*, 786 F.2d at 1053.

On September 28, 2008, West's treating physician Dr. LaCour submitted a letter on West's behalf stating:

> Karla West is a patient of mine with dermatomyositis, a disease that causes inflammation of the muscles and skin, and can cause significant weakness. Ms. West, in particular, has had significant involvement of muscle groups including respiratory muscles leading to significant difficulty breathing. She will need to be on immunosuppressant agents for the indefinite future. She remains generally weak on current treatment, and I do feel that she is totally disabled from doing any type of work.

Tr. 661. The ALJ found that this opinion "is totally contradicted by the specific notes of Dr. LaCour, himself, which described minimal findings and substantial relief of

symptoms with medications." Tr. 30. An ALJ may, by showing good cause, give minimal weight to a treating physician's opinion that a claimant is disabled when that opinion is "inconsistent with other evidence in the record." *Fries v. Comm'r of Soc. Sec. Admin.*, 196 Fed. Appx. 827, 833 (11th Cir. 2006).

Here, the ALJ supported his rejection of Dr. LaCour's opinion letter with a series of objective evidence which tends to refute that West is "totally disabled," much of it from Dr. LaCour's own records. On May 21, 2008, it was noted that West's dermatomyositis had improved dramatically with medications and the remainder of the records from 2008 described West as doing better and doing well. Tr. 24, 94, 608. On February 11, 2009, West returned to Dr. LaCour's office for cold symptoms, but no symptoms of dermatomyositis or lupus were reported. Tr. 24. West returned again on March 30, 2009, and Dr. LaCour noted that West was "doing well." *Id.* Similarly, Dr. LaCour reported West as "doing fine" except for some stiffness of the neck on June 1, 2009. *Id.* Records from August 11, 2009 note that West complained of upper arm weakness; however, no other symptoms of dermatomyositis were noted. Tr. 24, 851. West reported that she had a "little bit of trouble with picking up a 30-pound child." Tr. 24, 850. On October 12, 2009, Dr. LaCour noted symptoms of depression. Tr. 24, 843. West's came in for another visit on December 15, 2009, where Dr. LaCour noted, with regards to her dermatomyositis, that she was "clinically doing well," and that her strength has remained "excellent." Tr. 24-25, 849. Dr. LaCour noted that West had no complaints of weakness or pain. Tr. 25, 849. On February 15, 2010, Dr. LaCour noted that she had been off of her medication for two weeks, but everything was normal, her strength "is the

same and remains very good overall," and her joints had an "[e]xcellent pain-free range of motion throughout." Tr. 25, 847. On April 15, 2010, West was described as asymptomatic due to her normal strength, lack of manifestation of any weakness, pain-free range of motion and all rashes had cleared. Tr. 25, 839. During her final visit with Dr. LaCour, on July 20, 2010, West reported pain in her muscles and decreased strength, but Dr. LaCour noted that she had stopped taking her medicine nearly a month prior. Tr. 25, 825.

The Social Security Administration ("SSA") has spoken to the issue of the weight of treating sources:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."

20 C.F.R. § 416.927(c)(2), 404.1527(c)(2). Similarly, this Court has found that the ALJ has the "discretion to weigh objective medical evidence and may chose to reject the opinion of a treating physician while accepting the opinion of a consulting physician." *Gholston v. Barnhart*, 347 F. Supp.2d 1108, 1114 (M.D. Ala. 2003). West testified that her daily activities were minimal and only involved taking her medication and lying down; however, the ALJ found that the record "does not describe any basis for such a severe limitation of activity." Tr. 29. The ALJ noted that the "record reflects that [West]

has essentially normal findings when she takes her medications." *Id.* The ALJ found that the reports from Dr. LaCour "described significant periods during which [West's] strength was excellent, she had no ambulatory problems, she reported doing well, and was noted to be asymptomatic." *Id.* The ALJ found that "the only specific allegation of limitations noted by Dr. LaCour was in September 2009, when [he] described [West as] having trouble lifting a child who weighed 30 pounds, with later reports noting she was doing well and she was asymptomatic." *Id.* The ALJ concluded that "the record does not document any signs, symptoms, findings, or even allegations that [West] has significant limitations of her daily activities." *Id.*

The ALJ further noted West testified that her pain level was a nine out of ten on an average day without her medication, but found that "no medical record describes observations of that level of pain." *Id.* West also testified that her medications made her tired and caused her to sleep 4 to 5 hours per day, and she wakes up in pain. *Id.* The ALJ found "absolutely no support in the medical records for any alleged adverse medication effects, and the reports clearly show [West's] medications are effective, up to the point that she is asymptomatic." *Id.* The ALJ noted that no other treatment or specific measures used to alleviate symptoms were described in any of the medical records or in the testimony other than medications. Tr. 29. The ALJ found that the medical record "is void of any signs, symptoms, or findings supportive of [West's] testimony, and the specific treatment notes of record show that, with medications, her symptoms are substantially controlled." *Id.* The ALJ concluded that allegations of West being disabled are not credible. *Id.*

The ALJ never actually assigned greater weight to the reports of a State agency, nontreating, consulting physician over West's treating physician as she claims. In fact, the ALJ did not question a single medical record that was provided by Dr. LaCour. The ALJ used Dr. LaCour's own records to refute his opinion in the September 28, 2008 letter that stated that West was "totally disabled." Tr. 29-30, 661. The ALJ simply chose to adopt the limitations described in the reports from Dr. Jordan because he found them "consistent with the residual functional capacity." Tr. 30. It is clear that the ALJ found that Dr. LaCour's opinion contained in the September 28, 2008 letter to be inconsistent with the other evidence in the record. *See Fries*, 196 Fed. Appx. at 833.

The Eleventh Circuit has found that the ALJ is not required to give a treating physician's opinion statement substantial or controlling weight over a nontreating physician where the treating physician submitted a letter that listed the claimant's impairments and stated she was unable to return to work because "it arguably offered only a non-medical opinion on a matter reserved for the ALJ." *Kelly v. Comm'r of Soc. Sec.*, 401 Fed Appx. 403, 407 (11th Cir. 2010). The only mention that West is "totally disabled" is contained in the opinion letter provided by Dr. LaCour that merely lists West's impairments and provides a conclusion of "totally disabled." Tr. 661. Dr. LaCour's own medical records, however, do not support such a conclusion. Since the ALJ is not required to assign greater or controlling weight to an opinion letter that simply lists the claimant's impairments and states that she is unable to return to work, and the determination of disability is reserved for the ALJ, West's argument must fail.

Therefore, the Court finds that the ALJ properly weighed the evidence in the

record, and substantial evidence supports the ALJ's findings.

**B. The ALJ properly posed a complete hypothetical question to the VE.**

West asserts that the ALJ erred in failing to pose a complete hypothetical question to the VE. *See* Doc. 10 at 9. Specifically, West argues that the ALJ failed to compose a hypothetical that included visual acuity outlined in the physical examination completed by Dr. Banner and postural limitations outlined in the Physical RFC assessment completed by Dr. Richard Whitney, M.D. ("Dr. Whitney"). *Id.* On June 28, 2010, Dr. Banner completed a physical examination of West. Tr. 814-17. Dr. Banner did not impose any restrictions on West, but he did note visual acuity, loss of ranges of motion, and decreased strength of 3/5 in all muscle groups in upper and lower extremities. *See* Doc. 10 at 10; Tr. 814-17. Dr. Whitney completed a Physical RFC assessment based upon the medical records from Dr. Banner. Tr. 881-88. Dr. Whitney found that West could not climb a ladder/rope/scaffold; could occasionally climb a ramp/stairs, balance, stoop, kneel, crouch, and crawl; should avoid concentrated exposure to extreme temperatures; and avoid all exposure to workplace hazards. *See* Doc. 10 at 10; Tr. 883, 885.

The Court disagrees with West's argument for three reasons. First, West's argument fails because West's visual acuity and physical impairments were included in the hypothetical. The ALJ listed West's background information and told the VE to "embellish those facts with the facts found in Exhibit 24F and 23F." Tr. 53. Exhibit 24F includes the medical records from Dr. Banner's physical examination of West. Tr. 814-18. In Exhibit 24F, Dr. Banner notes that West's vision is 20/200 (Far) and 20/50 (Near),

and her vision is uncorrected. Tr. 816. Dr. Banner also did a full work up on West's extremities and noted the movement of each of West's joints, measured in degrees. Tr. 816-17. Dr. Banner also noted that all muscle groups in West's upper and lower extremities were at 3/5 strength. Tr. 817. After telling the VE to include the exhibits in the hypothetical, the ALJ verified that the VE had a chance to review those exhibits prior to the hearing and also offered the VE time to review those records during the hearing. Tr. 53. The VE responded that "[b]ased upon Exhibit 24F, which is the physical RFC, there is nothing that specifically described limitations that would preclude the individual from performing the past work." Tr. 53.

Second, to the extent West asserts that the ALJ should have included Dr. Whitney's Physical RFC in the hypothetical, the Court finds this argument lacking. West concedes that Dr. Whitney based his Physical RFC on the records from Dr. Banner; therefore, the VE had access to the exact same information that Dr. Whitney used to form his opinion of West's limitations. *See* Doc. 10 at 10.

Third, the ALJ was not obligated to ask the vocational expert about limitations not supported by the record. Although Dr. Banner found that West's visual acuity was uncorrected on June 28, 2010, just three days prior on June 25, 2010, Dr. Jordan noted that West "wore glasses" to the examination. Tr. 812. The record indicates that West's vision problems were corrected despite reports by Dr. Banner that they went uncorrected. Tr. 812, 816. Similarly, as discussed in the prior section, the ALJ found that based on the medical records as a whole, West's physical limitations are improved by medication, to the point that she is asymptomatic.

Therefore, the ALJ properly posed a complete hypothetical to the VE.

## VII. CONCLUSION

Pursuant to the findings and conclusions detailed in this Memorandum Opinion, the Court concludes that the ALJ's non-disability determination is supported by substantial evidence and proper application of the law. It is, therefore, **ORDERED** that the decision of the Commissioner is **AFFIRMED.** A separate judgment is entered herewith.

DONE this 19th day of October, 2012.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE